UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

JAMES BAKER,

                    Plaintiff,                                    Case No. 14-cv-14035

v.                                                               Honorable Thomas L. Ludington

DEBBIE ROYCE,

                    Defendant.

_____/

### ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff James Baker brought suit against Defendant Royce in Roscommon County Circuit Court on September 18, 2014. The complaint alleged the following three counts under Michigan common law: (1) that Royce slandered Baker by falsely accusing him of threatening to kill a coworker; (2) that Royce's false accusations constituted intentional infliction of emotional distress; and (3) that Royce tortiously interfered with Baker's employment contract with his employer by causing Lear to fire him. *See* Compl., ECF No. 1, Ex. 1. On October 10, 2014, Royce removed this action to federal court. ECF No. 1. On October 29, 2014, Baker filed a motion to remand, arguing that there was no subject matter jurisdiction. ECF No. 3. Royce answered and argued that removal was proper because Baker's state law claims were preempted under § 301 of the Labor Management Relations Act (LMRA), 29 U.S.C. § 185. ECF No. 4. On January 1, 2015, this Court concluded that Baker's state law claims were preempted by § 301 and denied the motion to remand. ECF No. 10.

After the close of discovery, Defendant filed a motion for summary judgment. *See* ECF No. 39. For the reasons stated below, Defendant's motion for summary judgment will be granted.

## I.

James Baker was hired by Lear as an hourly worker at its Roscommon plant on May 19, 2010. *See* Baker Dep. I at 9, ECF No. 39, Ex. 2. Debbie Royce has worked at Lear's Roscommon plant since January 26, 1998. Royce Dep. at 5, ECF No. 39, Ex. 5. Royce has served at least two terms as a union steward, an elected position responsible for representing union employees during grievances with Lear. Baker Dep. I at 83–84. Hourly workers at Roscommon are represented by United Auto Workers (UAW) Local 1819. Baker Dep. II at 13, ECF No. 39, Ex. 4. Baker worked without incident until June of 2012, when Baker joined an apprentice program for machine repair and maintenance. *See* Letter to Purvis at 1, ECF No. 39, Ex. 11. The apprentice program involved working third-shift. *Id.* Soon after starting the program, Baker began having problems with his third-shift coworkers. *Id.*

## A.

In July 2012, Baker received an invitation from third-shift supervisor Bob Reycraft to attend a meeting at Mr. Reycraft's house for a business venture he was planning. *Id.* Baker attended but declined the business opportunity. *Id.* After the meeting, Baker decided that it was improper for a supervisor to ask a subordinate to participate in a private business venture. *Id.*

Over the next twenty months, Baker submitted six complaints to Lear management. *See* Kato Dep. at 91, ECF No. 39, Ex. 6. Besides asserting that the meeting at Mr. Reycraft's house was improper, these complaints contained allegations of harassment, equipment sabotage, and retaliation by third shift coworkers. *See* ECF No. 39, Exs. 8, 9, 10, 13, 14. Specifically, Baker asserted that third shift employees had pointed lasers into his eyes while working, that company equipment was being used for personal repairs, that he was being blamed for equipment

problems he did not create, and that he was unfairly reported for "birddogging."[1] *See* Letter to Purvis 1. Around the same time, Baker's sister was also having problems with third-shift employees. Royce Dep. at 15–16, ECF No. 39, Ex. 5. Baker believed that the mistreatment suffered by him and his sister was retribution from Mr. Reycraft for refusing to join his business venture. *Id.* at 13.

In the face of this alleged mistreatment, Baker sent Rebecca Purvis, the plant's general manager, a letter on December 28, 2013 outlining his concerns about the potential retaliation and sabotage. *See* Letter to Purvis 1. On January 31, 2014, Ms. Purvis responded in writing. Letter to Baker, ECF No. 31, Ex. 12. Ms. Purvis explained, in part, that the company had found no evidence of harassment or retaliation. *Id.*

**B.**

On January 29, 2014, Baker reported another incident of sabotage. Baker Email, ECF No. 39, Ex. 12. This time, Baker also spoke to Debbie Royce about his concerns. Baker Dep. II at 49–50. At the time, Debbie Royce was a union steward, an elected position responsible for representing union members during disputes with the company. Baker Dep. I at 24.

On Saturday March 1, 2014, Baker approached Royce in the cafeteria with an envelope he wanted Royce to give to Bill Martin, the president of the union, outlining his concerns with ongoing workplace conditions. Baker Dep. II at 49.  At that moment, Royce was talking with Deborah White about scheduling a meeting to discuss employee complaints about Rebecca Baker, Plaintiff's sister. Royce Dep. at 15.

According to Royce, after Baker handed her the package, he began loudly objecting to the complaints lodged against his sister. *Id.* at 15–16. Royce then walked over to the cooler, and Baker followed while continuing to discuss his sister. *Id.* at 16. Royce told Baker that she was

---

[1] "Birddogging" means paying unnecessary attention to someone. Kato Dep. 99, ECF No. 32, Ex 5.

unable to discuss his sister's case with him. *Id.* According to Royce, Baker then followed her out of the lunchroom and towards her position on the line. *Id.* Baker was allegedly shouting that Mr. Reycraft was responsible for the complaints lodged against his sister. *Id.* at 17. Baker then allegedly told Royce that if anything happened to his sister, he would kill Mr. Reycraft. *Id.* Royce told him that she did not want to hear anything more. *Id.* Baker then allegedly repeated his threat twice and indicated that something might happen to Royce as well. *Id.*

According to Baker, he gave Royce a packet of documents at around 6:35 a.m. Baker Dep. II at 54. He denies saying anything to Royce about the complaints lodged against his sister. *Id.* Baker also denies threatening to harm Mr. Reycraft. *Id.* at 55. He further denies talking to Royce on the floor about anything that day. *Id.* at 55–56.

There were no witnesses who heard the alleged threat. *See* Kato Dep. at 8. However, there are several witnesses who attest that Baker belligerently confronted Royce on the morning in question. *See* Aff. Karmen Cornell, ECF No. 39, Ex. 14; Aff. Peggy Silk, ECF No. 39, Ex. 15; Aff. Sid Fuller, ECF No. 39, Ex. 16.

Royce reported to Joel Kato, the human resources manager for the plant, that Baker had threatened to kill Mr. Reycraft. Kato Dep. at 6. On Wednesday March 5, 2014, Mr. Kato met with Baker to discuss the allegation. Deb Royce and Deborah White were also present at the meeting. Baker Dep. II at 58. Baker denied making the threat. *Id.* at 59. Mr. Kato suspended Baker pending investigation of the allegation. Kato Dep. at 8. Baker was suspended until May 6, 2014, during which time he completed approximately six counseling sessions with Lear's employee assistance program provider. Baker Dep. I at 65; Kato Dep. at 9–10.

Mr. Kato investigated the alleged threat by asking Royce to submit a written statement. Kato Dep. at 8. He also asked Royce if there were any witnesses. *Id.* Because there were not, Mr.

Kato did not interview anyone besides Royce, Baker, and Ms. White. *Id.* at 16. Although the counseling provider ultimately determined that Baker did not have any violent propensities, MR. Kato believed that Royce's report was credible. *Id.* at 10–13.

On May 6, 2014, Baker met with Joel Kato and Adam Jelenic, another human resources employee at Lear. Baker Dep. II at 68. Kevin Molner was also present and acting as Baker's union representation. *Id.* at 68.  At the meeting, Mr. Kato informed Baker that he had violated two plant rules and would be discharged. *See* Disciplinary Rep. ECF No. 39, Ex. 19. Specifically, Mr. Kato found that Baker violated Rule A6, which prohibits threatening plant employees, and Rule B2, which prohibits distracting others or causing confusion by unnecessary shouting. *Id.*

## C.

The Collective Bargaining Agreement (CBA) between Lear and UAW Local 1819 at the Roscommon plant during the dates in question authorized Lear to discharge employees for "proper cause." CBA at 3, ECF No. 39, Ex. 1. The CBA also included a list of company rules and regulations for the Roscommon plant. *Id.* at 56. Violation of rules in List "A" were grounds for immediate discharge. *Id.* Rule A6 prohibits "[t]hreatening, intimidating, coercing, or interfereing with employers or Supervision at any time." *Id.* at 57. Repeated violation of rules in List "B" could result in written warnings, suspension, or even discharge. *Id.* Rule B2 prohibits "[d]istracting the attention of others, or causing confusion by unnecessary shouting, catcalls, or demonstration in the plant." *Id.* at 58. Rule B15c provides that: "Each condition observed by an employee that could result in an injury or property damage must be reported to his or her supervisor." *Id.*

Importantly, the CBA for the Roscommon plant also provided that union members who believe the company has violated the CBA can file a grievance. *See* Collective Bargaining Agreement, ECF No. 39, Ex. 1, at 5–6. Grievances proceed in five steps. In the first step, the employee verbally presents their grievance to their supervisor. *Id.* If the grievance is not resolved, the issue is reduced to writing and submitted to the department manager. *Id.* Under step two, the department manager will review the claim and answer the grievance. *Id.* If not settled at step two, the grievance can be appealed to the Shop Committee. *Id.* Under step three, that committee will consider the claim at its next meeting. *Id.* If still unresolved, a representative from UAW International may initiate step four by appealing to Lear's director of labor relations. *Id.* If the grievance is still unresolved after step four, UAW International can appeal to arbitration. *Id.*

Instead of appealing to arbitration, UAW sometimes attempts to resolve grievances through mediation. Ebenhoeh Dep. at 41–42, ECF No. 39, Ex. 20. UAW prefers mediation to arbitration because it is more economical. *Id.* at 42.

**D.**

Immediately after his discharge, Baker and his union representative, Mr. Molner, decided to file a grievance pursuant to the CBA procedures. Mr. Molner represented Baker through the first three grievance stages, which Lear denied. Baker Dep. I at 76.

At stage four, Matt Ebenhoeh, a UAW International employee responsible for defending union members in stage four and five grievances, took over representation of Baker. *Id.* Immediately upon beginning his representation of Baker, Mr. Ebenhoeh requested all of Local 1819's investigative notes on the grievance. Ebenhoeh Dep. at 27. After reviewing those documents, Mr. Ebenhoeh arranged a meeting with Baker. Baker Dep. I at 78. At that meeting,

Mr. Ebenhoeh heard Baker's account of the dispute and discussed the grievance documents with Baker. Ebenhoeh Dep. at 33. Mr. Ebenhoeh was unable to find any corroborating witnesses for either Baker's or Royce's account. *Id.* at 29.

Mr. Ebenheoh then advocated for Baker at the stage four hearing before the bargaining committee. *Id.* at 36. After the hearing, the committee offered to reinstate Baker with back pay and move him to second shift if Baker apologized. *Id.* at 41. Baker refused the offer. *Id.*

At this point, Mr. Ebenhoeh had only two options for continuing the grievance: mediation or arbitration. Mr. Ebenhoeh asked Baker if he was willing to use mediation to try and resolve the grievance. *Id.* Baker agreed. *Id.* The mediator chosen was Larry Sedrowski, who Mr. Ebenhoeh believed to be union-friendly and trustworthy. *Id.* at 42. Prior to mediation, Lear asked if Baker would be willing to accept the mediator's decision as binding. *Id.* at 44.

The parties dispute whether Baker agreed that the mediation would be binding. According to Baker, he did not know the company agreed to be bound by the mediator's decision and he did not agree to be bound himself. Baker Dep. I at 87. According to Mr. Ebenhoeh, Baker was asked on three separate occasions before the mediator rendered his decision if he would accept it as binding. Ebenhoeh Dep. at 44. In each instance, Baker agreed. *Id.* Once both sides presented their cases, the mediator denied Baker's grievance. *Id.* at 47.

## II.

Defendant has now moved for summary judgment. A motion for summary judgment should be granted if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the initial burden of identifying where to look in the record for evidence "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*,

477 U.S. 317, 323 (1986).  The burden then shifts to the opposing party who must set out specific facts showing "a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (citation omitted).  The Court must view the evidence and draw all reasonable inferences in favor of the non-movant and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52.

## III.

Plaintiff voluntarily consents to the dismissal with prejudice of Count II, alleging Intentional Infliction of Emotional Distress, and Count III, alleging Tortious Interference with Contractual Relations. *See* Pl. Resp. Mot. Summ. J. at 7, ECF No. 44. Accordingly, the only issue is whether Defendant's motion for summary judgment as to Count I, alleging Defamation, should be granted. Baker's state law defamation claim is preempted by § 301, but Baker is seeking money damages from an individual union member, which is not permitted by § 301. Further, Baker has not pleaded facts satisfying the elements of a § 301 claim. For these reasons, Royce's motion for summary judgment will be granted.

## A.

As already noted, this Court ruled on January 1, 2015 that Baker's state law claims were completely preempted by § 301 of the LMRA. *See* ECF No. 10. As that opinion explained,

> Certain areas of law are so intrinsically federal in nature that they are deemed to have completely preempted all other state laws and regulations on that subject. *Sullivan v. Am. Airlines, Inc.*, 424 F.3d 267, 272 (2d Cir. 2005) ("Under the complete-preemption doctrine, certain federal statutes are construed to have such 'extraordinary' preemptive force that state-law claims coming within the scope of the federal statute are transformed, for jurisdictional purposes, into federal claims—i.e., completely preempted."). Any case that calls for adjudication of a parties' rights, duties, or obligations in one of these areas always presents a federal question. *Id.* "The Supreme Court has only found three statutes to have the requisite extraordinary preemptive force to support complete preemption[.]" *Id.*

- 8 -

Section 301 of the Labor Management Relations Act has created one of these areas. *Avco Corp. v. Aero Lodge No. 735, Int'l Ass'n of Machinists & Aerospace Workers*, 390 U.S. 557, 558–563 (1968).

The Sixth Circuit has developed a two part test for determining whether § 301 preemption applies to a dispute. *DeCoe v. Gen. Motors Corp.*, 32 F.3d 212, 216 (6th Cir. 1994). "First, the district court must examine whether proof of the state law claim requires interpretation of collective bargaining agreement terms." *Id.* When making this determination "the court is not bound by the 'well-pleaded complaint' rule[.]" *Id.* Rather, the court must "look[] to the essence of the plaintiff's claim, . . . to determine whether the plaintiff is attempting to disguise what is essentially a contract claim as a tort." *Id.* If the essence of a plaintiff's claim is contractual in nature, the claim is dependent on the CBA and presents a federal question. *Id.* Relatedly, if "evaluation of the tort claim is inextricably intertwined with consideration of the terms of the labor contract" the claim is preempted. *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 213 (1985). In the second step of the inquiry, "the court must ascertain whether the right claimed by the plaintiff is created by the collective bargaining agreement or by state law." *Id.* Similarly, if the right claimed arises out of the CBA then a federal question is presented.

*Id.*at 3–4.

The opinion concluded that Baker's defamation claim could succeed only if Royce's statement was not privileged. *Id.* at 6–7. Because Royce arguably had a duty under the CBA to report the threat to her supervisor, and thus Royce could have had a reasonable belief that her statement was privileged, Baker's defamation claim could not be decided without interpreting the terms of the CBA. *Id.* at 7–8. Accordingly, Baker's defamation claim is preempted by § 301.[2]

*Id.* at 8. When a state law claim is preempted by § 301, the "claim must either be treated as a § 301 claim or dismissed as pre-empted by federal labor-contract law." *Allis-Chalmers Corp.*, 471 U.S. at 220 (citation omitted).

**B.**

---

[2] Baker cites *Linn v. United Plant Guard Workers of Am.*, 383 U.S. 53, 61–62 (1966), for the proposition that state law claims for defamation are not preempted by the LMRA. But, as discussed in this Court's January 1, 2015, ruling, state law defamation claims are preempted by § 301 if the plaintiff cannot show the statement was unprivileged without interpreting the CBA. *See DeCoe*, 32 F.3d at 217. *Linn* is inapplicable because proving defamation in that case was not dependent on an interpretation of the CBA.

Before bringing suit under § 301, an employee must attempt to exhaust internal union remedies. *Clayton v. Int'l Union*, 451 U.S. 679, 681 (1981). Royce argues that Baker failed to exhaust all grievance procedures before bringing suit and that the suit should consequently be dismissed.

Here, Baker exhausted all remedies. He asserted his grievance through the first four stages provided by the CBA. Although Baker agreed to attempt mediation, he did so at the request of his union representative. The parties dispute whether the mediation was binding, but there is no dispute that the decision whether to bring the grievance to arbitration was solely in the hands of the UAW. Ebenhoeh Dep. at 42–44. *See also Vaca v. Sipes*, 386 U.S. 171, 193–94 (1967). Thus, Baker was unable to control whether the grievance would proceed to arbitration, and the fact that the grievance ended in mediation rather than arbitration does not mean Baker failed to exhaust his administrative remedies. On the contrary, Baker made clear that he wanted to arbitrate his grievance and filed this suit only after it was clear that arbitration would not happen. *See* Ebenhoeh Letter, ECF No. 39, Ex. 31. Baker made a reasonable attempt to exhaust his internal union remedies.

## C.

Royce next argues that Baker's suit should be dismissed because § 301 actions do not permit recovery of economic damages against individual union members. If a union breach of contract is alleged, the fact that the plaintiff is suing the union's agents instead of the union itself does not take the action outside the scope of § 301. *Atkinson v. Sinclair Ref. Co.*, 370 U.S. 238, 247 (1962). In *Atkinson*, the Supreme Court held that § 301 does not authorize an action for damages against individual union officers even if the union is liable for violating a no-strike clause in the CBA. *Id.* at 249. In *Complete Auto Transit, Inc. v. Reis*, the Supreme Court further

- 10 -

held that "§ 301(a) does not sanction damages actions against individual employees for violating the no-strike provision of the collective-bargaining agreement, whether or not their union participated in or authorized the strike." 451 U.S. 401, 417 (1981). With "monotonous regularity," the federal courts of appeals have extended *Atkinson* "to foreclose state-law claims, however inventively cloaked, against individuals acting as union representatives within the ambit of the collective bargaining process." *Montplaisir v. Leighton*, 875 F.2d 1, 4 (1st Cir. 1989) (citing *Peterson v. Kennedy*, 771 F.2d 1244, 1256-57 (9th Cir.1985), *cert. denied*, 475 U.S. 1122 (1986); *Universal Communications Corp. v. Burns*, 449 F.2d 691, 693-94 (5th Cir.1971) (per curiam); *Suwanchai v. Int'l Bhd. of Electrical Workers*, 528 F.Supp. 851, 861-62 (D.N.H.1981)). *See also Evangelista v. Inlandboatmen's Union of Pac.*, 777 F.2d 1390, 1400 (9th Cir. 1985) ("[T] he protection of section 301(b) extends to state tort claims against union officials and members brought in conjunction with a section 301 breach of duty claim against a union."). Even where the union member is acting solely in his or her personal capacity, the union member cannot be sued for money damages under § 301. *See United Steelworkers of Am. v. Lorain*, 616 F.2d 919, 924 (6th Cir. 1980).

Here, Baker is seeking monetary damages against Royce. As already mentioned, Baker's suit must be construed as a § 301 suit because his claim requires interpretation of the CBA. Under *Atkinson*, union officials are protected from "state-law claims, however inventively cloaked," seeking money damages. *Montplaisir*, 875 F.2d at 4. *See also Atkinson*, 370 U.S. at 249. Accordingly, Baker's claim for damages against Royce is unauthorized by § 301, and Baker's suit against Royce will be dismissed for failure to state a claim.

**D.**

Finally, Royce argues that Baker's claim should be dismissed because there was no violation of § 301. To recover through a § 301 action, the employee must demonstrate both that the employer breached the collective bargaining agreement and that the union breached the duty of fair representation. *Black v. Ryder/P.I.E. Nationwide, Inc.*, 15 F.3d 573, 583 (6th Cir. 1994). Because the two claims are "'inextricably interdependent,'" the employee cannot recover against either party unless the employee makes both showings. *Id.* at 583–84 (quoting *DelCostello v. Int'l Bhd. of Teamsters*, 462 U.S. 151, 164 (1983)).

Baker has failed to even allege that Lear violated the CBA in discharging him or that UAW breached its duty of fair representation during the grievance process. Thus, even if a suit for money damages could be brought against Royce, Baker's claim would be dismissed for failure to demonstrate evidence which constitutes a genuine issue of material fact.

**IV.**

Accordingly, it is **ORDERED** that Defendant's motion for summary judgment, ECF No. 39, is **GRANTED.**

It is further **ORDERED** that Counts 1, 2, and 3 of Plaintiff Baker's complaint, ECF No. 1, are **DISMISSED with prejudice**.

Dated: August 26, 2016                                    s/Thomas L. Ludington
                                                                        THOMAS L. LUDINGTON
                                                                        United States District Judge

| PROOF OF SERVICE |
| --- |
| The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on August 26, 2016.<br><br>                              s/Michael A. Sian<br>                              MICHAEL A. SIAN, Case Manager |